**TRANSCRIBED FROM DIGITAL RECORDING**

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

UNITED STATES OF AMERICA,                    )
                                             ) Case No. 25 CR 321-4
             Plaintiff,                      )
                                             )
             vs.                             )
                                             )
SUHAIB AHMAD CHAUDHRY,                       ) Chicago, Illinois
                                             ) July 8, 2025
             Defendant.                      ) 11:07 A.M.
                                             )

      TRANSCRIPT OF PROCEEDINGS - Arraignment and Detention
   BEFORE THE HONORABLE DANIEL P. McLAUGHLIN, Magistrate Judge

APPEARANCES:

For the Government:        HON. ANDREW S. BOUTROS
                           219 South Dearborn Street
                           Chicago, Illinois  60604
                           BY:  MS. SHERI MECKLENBURG

For the Defendant:         CLARK HILL PLC
                           130 East Randolph Street
                           Suite 3900
                           Chicago, Illinois  60601
                           BY:  MR. LEIGH D. ROADMAN
                                MR. MASON N. FLOYD

ALSO PRESENT:              Ms. Danaysy Diaz
                           Pretrial Service Officer


                    PAMELA S. WARREN, CSR, RPR
                 Official Court Reporter - Retired
                    23869 N. High Ridge Drive
                 Lake Zurich, Illinois   60047
                         312.823.0001

NOTE:  Please notify of correct speaker identification.

(Proceedings held in open court:)

THE CLERK: 25 CR 321, United States versus Suhaib Ahmad Chaudhry.

Your Honor, I don't see --

MS. MECKLENBURG: Sheri Mecklenburg on behalf of the United States. And I don't see -- oh, I'm sorry. Okay.

THE COURT: He's entering the courtroom.

MS. MECKLENBURG: Okay.

THE COURT: Nice to see you, Ms. Mecklenburg.

MS. MECKLENBURG: You too.

MR. ROADMAN: Good morning, your Honor. Leigh Roadman and Mason Floyd on behalf of Suhaib Chaudhry, who is here with us in court.

THE COURT: Okay. Good morning to you both.

Good morning, Mr. Chaudhry.

THE DEFENDANT: Good morning.

THE COURT: Okay. Oh, and pretrial services is here. Thank you.

MS. DIAZ: Good morning, your Honor. Danaysy Diaz for pretrial services.

THE COURT: Okay. Nice to see you, Officer Diaz.

Okay. So we are here for an arraignment, and then we're here to talk about conditions of release; is that correct?

MS. MECKLENBURG: Yes, your Honor.

MR. ROADMAN: Yes, your Honor.

THE COURT: Okay. And my understanding is that Mr. Chaudhry had his initial appearance down in Texas; is that right?

MR. ROADMAN: He did.

THE COURT: Okay. So that makes things a little simpler for today. And so what we'll do first is the arraignment.

And I -- I'm not going to do a full initial appearance sort of thing where I give you all your rights, sir, because your rights -- you were informed of your rights, I assume, when you were down in court in Texas, okay?

THE DEFENDANT: Yes, your Honor.

THE COURT: Okay. And if you could keep your voice up please, that's helpful. Thank you.

THE DEFENDANT: Yes.

THE COURT: So Ms. Mecklenburg, can you briefly summarize the charge against Mr. Chaudhry and the maximum possible penalty if he was convicted of that charge?

MS. MECKLENBURG: Yes, your Honor. Mr. Chaudhry is charged in Count Nineteen with money laundering conspiracy under 18 USC Section 1956(h). That violation carries a penalty of up to 20 years's imprisonment with a supervised release of up to three years and also a financial penalty of up to $500,000 or twice the value of the monetary instruments

involved, which at this time our information the value was approximately 6.3 million.

THE COURT: Okay. So Mr. Chaudhry, I'm just asking you did you -- if you heard what Ms. Mecklenburg said, do you understand the potential penalties that may apply?

THE DEFENDANT: Yes, your Honor.

THE COURT: Okay. Great. Thank you.

And counsel, have you received a copy of the indictment?

MR. ROADMAN: We have, Judge. We had an opportunity to review it with Mr. Chaudhry. And we'll acknowledge the receipt, waive a formal reading, and enter a plea of not guilty for him to Count Nineteen, which is the only count he's charged in.

THE COURT: Okay. Great. Thank you.

So a plea of not guilty will be entered on Count Nineteen, which as counsel mentioned is the only count against Mr. Chaudhry.

Okay. So let's talk about conditions of release. And so my view of this, and this is not -- I have seen a couple of defendants now in this case, so I have a little bit more familiarity with it now than I did perhaps last week.

The conditions that were put in place down in Texas -- and this won't be a surprise to Ms. Mecklenburg -- some of them just don't make a whole lot of sense to me literally. I don't

know what some of them even mean.  And every -- every district has its own custom and practice.  I'm not throwing any shade at them.  I just -- I don't know why they say things the way they say.

So where I fall here is pretrial services in this district issued its own report which recommends certain conditions of release that are considerably fewer than those that were put in place down in Texas.

I saw your filings last night, each side.  And so I guess -- and I'll certainly hear argument, if you would like to argue, but I'm -- my view of this is that Mr. Chaudhry is -- you know, the sort of sticking points for me are he doesn't appear to have a lot of ties to the community down in Texas.

And Mr. Chaudhry, just to be clear, you're going to be released.  I'm not considering detaining you.  And I know that the government filed something last night and it -- a label applied to it at the time of filing that actually I saw when I was at home and I thought, oh, my gosh, they're moving for detention, that doesn't make any sense.

MS. MECKLENBURG:  I'm not seeking detention, your Honor.

THE COURT:  So you're going to be released, sir.  I'm just trying to figure out what the conditions are going to be.  And so let me take the air out of the balloon in terms of anxiety if you are worried about that.

The concerns I have in terms of fashioning those conditions, Mr. Chaudhry, are that you don't have, what appears in the reports, to be local family. It sounds like you live by yourself. And there is nothing wrong with those things certainly, but those are things that the bond statute asks the Court and requires the Court to take into consideration under sort of the label of ties to the community and in terms of your personnel characteristics.

And so -- and then the additional issue that I was thinking about as I was thinking about this case is -- and I know, it goes back some way and is just that you were apparently present on a private jet that was scheduled to depart and leave the country. I know that was some time ago. I know that it was long before the charges were filed in this case. But that does give me some pause in terms of considering what we ought to do and what we should to in order to be reasonably certain that you're going to appear in court when you're required to appear in court.

And so I don't think that the conditions that have been recommended by pretrial services here in the Northern District of Illinois are enough. I think there needs to be more there.

And so, you know, my -- my sense of this is that I'll certainly impose the conditions that the local pretrial services required -- or recommended, rather, but then I'm going

to require some additional conditions as well.

And so I'll hear argument. And Ms. Mecklenburg -- I just want to tell you all that just to give you a sense of where my head is at on this.

And so Ms. Mecklenburg, you know, I know you were here last week. The financial conditions -- and maybe that's not even the best label -- with respect to bank statements, credit check, the -- I saw that thing again about the federally -- I don't even remember what the phrase was. I'm not going to impose those conditions.

MS. MECKLENBURG: And I'm not asking to, your Honor.

THE COURT: Okay. Great.

So in terms of additional conditions that you believe are essential, could you -- if you want to briefly argue those, I'll hear from you now.

MS. MECKLENBURG: Yes, your Honor. Clearly you understand what my concerns are. And I don't really know how we can address them short of I need some security that Mr. Chaudhry is not going to flee. Either some sort of custodian or -- and/or property. But I have been told that he cannot do either. Or to continue with the electronic monitoring.

Houston has said they're going to do the pretrial supervision and Houston is willing to do the electronic monitoring.

THE COURT: Okay. All right. And then defense counsel, do you all want to weigh in on that?

MR. ROADMAN: Sure. I mean, Judge, what seems to be driving the bus on this thing of him being a flight risk is this incident related to the airplane. In May of 2024, he was, at the time, working for Anosh, Inc. It was an overseas business trip which was scheduled. It was going to be a stop in Dubai and then onto London where they were negotiating over various businesses that were going to be opened up and getting real estate and things like that.

The private plane was -- was Mr. Anosh Ahmed had leased that. His father was on that, who at the time was in very poor health, and that was the reason they had the private plane.

This plane also had Heather Bergdahl (phonetic) on it, who was arrested and pulled off the plane, and Mr. Chaudhry because they were going on the business trip together.

The plane had pulled out. It was on the tarmac, as I understand it. Agents came out, boarded the plane, took Ms. Bergdahl off. Mr. Chaudhry -- there was no arrest warrant out for Mr. Chaudhry, anything like that. He voluntarily got off and stayed in the United States.

The plane took off with the family members and went over to Dubai as it was scheduled to do.

THE COURT: Uh-huh.

MR. ROADMAN: Yes, everybody says, well, there is a private plane involved. He could take off at any point in time.

The best evidence that he's not going to do it is he could have done it then and he didn't. I mean, this investigation had -- he had been aware of it for well over a year at the time. We have responded to multiple, multiple, multiple subpoenas by producing probably about 50,000 documents. We have been over. We have talked with the prosecutor about the case. He had not gone in and proffered because our discussions did not lead to where we, as defense counsel, felt that that was in his best interests to do that.

But this was not a case that he was not aware of. He was aware of what was involved, extensive documents, all the allegations that were being made, all that.

He didn't take off. He could have. He didn't take off that day; he didn't take off later.

In December of that year, he was stopped on a traffic stop, and FBI agents came up, served another warrant, took his phone away. Again, if he wanted to take off or he was really worried about facing, you know, a day in court someday, he could have taken off then. He didn't.

He was at his house. He got arrested. He's come voluntarily here.

You're -- they are correct in that he doesn't have

family members in Houston. He's lived there his entire life. He has always been gainfully employed. He has no criminal record, all the things that you would expect of somebody who has never been involved with the criminal justice system at all.

He's turned in his Pakistani Passport, which they found. His U.S. Passport they could not find. We filled a form out at the -- at the suggestion of the U.S. Attorney's Office that we fill out a form reporting it as stolen to the Department of State, and that has been filed. They have got the copies of it. He no longer has a passport.

So while I get the idea of electronic monitoring, I mean, you know -- he's doing what he has always been doing. He's been in Houston working. Now he can't work for Anosh. He is going to have to get a new -- wearing an ankle bracelet is not exactly, you know, great when you're going and trying to find a job.

And whether he's able to find a job in the Houston area or whether he has to go somewhere else to do it or whether he has to travel, I just don't see him as a flight risk. He had every opportunity to take off if he wanted to, and he never has.

THE COURT: Let me ask you this, Mr. Roadman. So I noted in the government's filing last night that there was some suggestion that he had gone -- Mr. Chaudhry had said goodbye to

people or something like that or made some statement to the effect of he didn't know when he was coming back or something like that. And I -- I wasn't sure -- you know, I don't know the investigation and I don't know if you do at this point either. I don't know where you are with the discovery and whatnot. And I know it is early days. But do you have any knowledge of that? Do you have any understanding of that?

MR. ROADMAN: I believe he did say goodbye to people. But let's put it in context. This was a -- going to be a multi-month business trip with coming back, okay? As they were planning this business trip, there were people where he said, I'm going on this business trip, I'm going to be gone, goodbye. I say goodbye to my wife every morning, right?

You know, so I mean, it is like, it doesn't mean when you say "goodbye" I'm never coming back again. That's their view of it. I don't. There was one, we believe, cooperating witness who seemed to have been doing a lot of prompting of trying to get people to say, oh, we're never coming back. That wasn't what this was about.

THE COURT: Okay. Ms. Mecklenburg, do you have any response to anything?

MS. MECKLENBURG: I do, your Honor. Keep in mind that Ms. Bergdahl had put all of her belongings in storage before this trip, said goodbye to her parents, and gave them her cat. And they said this was unusual.

So it was not just a simple business trip. I think that is trivializing it a little bit.

And that Mr. Chaudhry had told people that he did not know when he would be back. That's different than a standard business trip.

The other issues that I have here is that his employment is going to have to change. And while they say that -- while Mr. Roadman points out that Mr. Chaudhry has no criminal history, he has been involved in this criminal enterprise and scheme since 2021. Going along with it, this was what they were doing was this scheme to seek claims -- to put in claims for fake COVID testing. And he wasn't just -- even though he's charged in the one count, he worked with them on this.

So this is his involvement for the past four years. Anybody would have known this is something -- this is fraud, I shouldn't be doing this, I have got to get out. The fact that he has done this for four years makes me concerned over his moral compass.

And it is true that he did get off the plane when he did not have to. But at that time, keep in mind, that he was not charged. This time -- this investigation took longer than, at least I had hoped, because of a lack of resources in many ways. So I think that takes some -- comfort to people that they weren't going to be charged.

And what this shows is the vast resources he has access to through on that. It shows immense interest in having this defendant in the UAE with him. And it shows how easily and quickly he not only can leave if he wants, but that he's willing to. Because if somebody said to you, why don't you come over here for months and months and months with no return flight, that would be a problem for most people who make their home here and consider this to be the place where they're going to be.

So without any ties in the community, with employment right now being iffy, and with his history of a long-term involvement with Anosh Ahmed and his wrongdoing, I believe that we should have some extra measures to make sure that he does not flee.

THE COURT: Okay. All right. So here's what I am going to do. I'm going to issue -- I'm going to go over with you all briefly the conditions of release that I am anticipating putting in place, because I may need some help from you to make sure that they are fine tuned.

And so, Mr. Chaudhry, I want you to listen because many of these will apply to you certainly, and some we're going to flesh out a little bit here. Okay?

THE DEFENDANT: Yes, your Honor.

THE COURT: Okay. So Mr. Chaudhry must submit to supervision of pretrial services. And the pretrial services

office in the Southern District of Texas will be the one that's supervising him on a day-to-day basis as a courtesy.

Sir, you're going to have to continue to work or to actively seek employment. I know you have already surrendered your Pakistani Passport and you have filled out paperwork with respect to your U.S. Passport.

What I would say, sir, is that if you find any sort of travel document, you know, as you're cleaning out your basement or whatever it is you're doing, you need to turn those in immediately. Okay? And you're absolutely forbidden from obtaining a new passport or international travel document.

Do you understand that, sir?

THE DEFENDANT: Yes, your Honor.

THE COURT: Okay. So I'm just going to write on here, even though it has already been done, I'm going to emphasize surrender any passport to pretrial services.

I'm just going to make a note that the Pakistani Passport has been surrendered. U.S. Passport is purportedly stolen or lost. Report -- I'll have to say lost.

MR. ROADMAN: Judge, we -- that form has already been provided --

THE COURT: All right.

MR. ROADMAN: -- to the U.S. Attorney's Office and to Ms. Mecklenburg back on June 18th.

THE COURT: Okay.

MS. MECKLENBURG: Yes, your Honor.

MR. ROADMAN: Well, we reported it as -- to the Department of State as stolen.

THE COURT: Okay.

MR. ROADMAN: Or missing, I guess, is the best way to put it.

THE COURT: I'll change lost to missing. I think that's a better word. I agree.

Okay. Travel restrictions, sir, you are going to be limited in your travel in the United States. You're not to leave the country. Obviously you can't, you don't have a passport.

And then with respect to Condition 7G as in George, this is where we get into the contact and who you can have contact with and who you cannot.

And is there an attachment for that?

MS. MECKLENBURG: Yes. But before you move on, your Honor, travel restrictions, I think it is too broad, frankly. And I think he should at least be restricted to the Southern District of Texas and the Northern District of Illinois.

But if you're going to give him travel in the United States, then at least make it the Continental United States.

THE COURT: No Hawaii?

MS. MECKLENBURG: Because if he gets on a plane and goes somewhere like Hawaii or Alaska, it is harder for us to

even know when -- where he is and when he's coming back.

MR. ROADMAN:  We're fine with Continental United States, Judge.

THE COURT:  Okay.  Is that -- do you think that's true?

MS. MECKLENBURG:  I do.

THE COURT:  If he goes to Hawaii or Alaska it is harder to know where he is than if he is in Kansas City?

MS. MECKLENBURG:  I haven't had anybody flee during bond so I don't -- I'm not an expert on it.

THE COURT:  All right.  Well, let's keep that hot streak going.  I -- I am -- we'll make it Continental United States with the agreement of defense counsel.

All right.  So now we're at 7G, which is the contact, direct contact.  And these are the folks that you're not permitted to have any contact with.  And there is going to be an -- an attachment, right, with the names.

Is that correct, Ms. Mecklenburg?

MS. MECKLENBURG:  Yes.  And in fact I have already provided it to counsel.

THE COURT:  Okay.  Okay.  And so do you have that in front of you, sir, or have you had a chance to review that attachment?

THE DEFENDANT:  Yes, your Honor.

THE COURT:  Do you have any question about any of the

names on there or who those folks are or whether you can have any contact with them?

THE DEFENDANT: No, your Honor.

THE COURT: Okay.

MS. MECKLENBURG: And, your Honor, they might be looking at the attachment that's from the Houston court. But I have given them an updated attachment.

THE COURT: Okay.

MR. ROADMAN: If --

MS. MECKLENBURG: So it is --

MR. ROADMAN: If I could step over and --

MS. MECKLENBURG: Yes.

THE COURT: Yeah. Why don't you confer and make sure you're talking about the same attachment.

(Discussion off the record.)

MS. MECKLENBURG: They have the updated attachment, your Honor.

(Brief interruption.)

MS. MECKLENBURG: Okay. It looks like they have the updated list, your Honor.

THE COURT: Okay. Great.

MS. MECKLENBURG: Thank you.

THE COURT: Thank you.

Okay. You're not to possess a firearm, destructive device, or any other weapon.

Do you understand that, sir?

THE DEFENDANT:  Yes, your Honor.

THE COURT:  Okay.  Pretrial here did not indicate any need for drug testing.  I don't see any need for that based on the information that's in front of me.

Does anyone disagree with that?

MS. MECKLENBURG:  The government is fine with that, your Honor.  We have no evidence that that's needed.

THE COURT:  Okay.  And so here's where I come down on the issue of flight and what to do about electronic monitoring. I agree with much of what defense counsel says in terms of this has been out there for some time.  And the best evidence that Mr. Chaudhry is not going to flee is the fact that he's continued to stay in the country even though he has had at least historical opportunities to leave.

At the same time I am concerned about the lack of, I won't say connections in the community because I -- I think he likely has some connections through employment and things like that -- but the lack of family ties, the fact that he lives alone, the fact that there was -- you know, I -- even if I accept defendant's view of the flight in 2024, I think the fact that he has access to that is concerning from a flight perspective.

So I'm going to require that there be some conditions put in place at 7P as in Patrick.

So you're going to be required -- you're going to be on a curfew, and you're going to be on curfew with electronic monitoring. And so you're going to be restricted -- well, let me think about this.

Actually I'm going to make it home detention because that allows him movement for work. And then if he has to travel for work, we don't have to get into whether he's home during the curfew time.

So it is going to be home detention. Which means, sir that you're going to be able to work; to attend courses, if you are taking courses; religious services; medical appointments, if you have them; attorney visits; court appearances. Basically anything structured that you need to attend to in your life, you're going to have the ability to do those things. But when you're not doing those things, you're going to need to be home, sir.

And in terms of the actual technology that's used, Ms. Mecklenburg -- I'm looking at 7Q. Ms. Mecklenburg, do you have a sense from -- I know that -- I think if I understand correctly, down in the Southern District of Texas they use actual location monitoring technology; is that right?

MS. MECKLENBURG: That's my understanding.

THE COURT: Okay. Let me just look real quick at what they impose.

And Officer Diaz, do you have any information on that?

MS. DIAZ: I am not sure what Texas uses, your Honor.

THE COURT: Okay.

MS. DIAZ: Usually when location monitoring is imposed, we like to leave it up to pretrial services to determine the frequency -- I don't know the wording. It is on the second page. I -- if I can take a look at it. It is usually to be determined by pretrial services.

THE COURT: In terms of the actual technology that's used?

MS. DIAZ: Correct.

MR. ROADMAN: Judge, I have a copy of the Texas order. And what they checked on Q was standalone monitoring and GPS. So they use the GPS technology.

THE COURT: Okay. So I'm going to check GPS and -- just to keep it consistent, and then I'm going to put in parentheses, at the discretion of pretrial services.

Is that agreeable to the government?

MS. MECKLENBURG: That is, your Honor.

THE COURT: Okay.

MS. MECKLENBURG: When you say at the discretion, you mean the type of technology, but not the location monitoring necessarily?

THE COURT: Correct. I'll say at the discretion of pretrial services to determine the type of technology to use.

MS. DIAZ: Your Honor?

THE COURT: Yes.

MS. DIAZ: With respect to the Court and the condition imposed, the location monitoring, I just wanted to put it on the record that pretrial does object to the location monitoring condition. Pretrial services has not utilized location monitoring to mitigate risk of nonappearance. It is used to mitigate the risk of danger to the community.

THE COURT: Okay. Thank you.

MS. DIAZ: Yes.

THE COURT: Okay. And then 7S as in Sam. Mr. Chaudhry, you're going to need to report to pretrial services any contact with law enforcement. And that would include anything like a traffic stop. I know you have had a traffic stop in the past.

You know, if -- any time that a police officer stops you, asks for your identification, that information gets logged into a database. And your pretrial services officer is going to get reports about that. And if they learn from that report that you have had contact with law enforcement but they haven't heard it from you first, it can cause some problems, okay? And so that's going to be a condition that I put in place.

Ms. Mecklenburg, are there additional conditions that the government is seeking?

MS. MECKLENBURG: No. But I would like to go back to the travel restriction or lack of travel restriction. How will

that work? If he is allowed to go throughout the United States, how will that work with home detention?

It seems to me that he should be restricted to his district and our district. And then if he has to travel out of the district for a reason, such as an employment or a family event or something, then he should get pretrial services's approval.

THE COURT: So if he is limited to home detention, I'm leaving Continental -- and let's say he has got a job in the -- he has got to travel to out of town for two days or something like that, he's going to be able to do that with the conditions that are in place here without having to come to court and get a court order to do that.

And so I don't see any inconsistency there. I understand your point. But it leaves open the possibility that if he is working; if he has got to travel; if he wants to go do a job interview in a different city, since he's got to find a new job now; he's going to be able to do that based on the order that's entered here today instead of having to come back and modify the conditions with motion practice.

MS. MECKLENBURG: And I'm not looking for him to have to modify it, but to have to at least ask pretrial services so that they know where he is. Because otherwise he's not going to be on home detention, and they are not going to know why. If he is just going somewhere else, pretrial is going to have

no idea why he is not on home detention.

THE COURT: Well, no. He can't go somewhere else unless it is for one of the purposes that are listed under home detention. He can't leave the house unless those are the things that he's out for.

MS. MECKLENBURG: So the order is that he's on home detention, and then for these purposes only he can travel the United States?

THE COURT: Yeah. I mean, he -- the only purposes for which he can get out of the house are the purposes that are listed in P2. So that would be work, education, or religious services, medical appointments, substance abuse, et cetera, court appearances, court-ordered obligations. And so if and when those things come up and they require travel in the Continental United States, he can do it on this order.

He doesn't have the free ability to just travel around the country --

MS. MECKLENBURG: Okay.

THE COURT: -- at --

MS. MECKLENBURG: Then I would ask that we include language under F that his travel is subject to 7P2 to make that clear. Because if I didn't understand it, then I am concerned that pretrial services in Houston won't. I'm concerned that --

THE COURT: Okay. That's fine.

MS. MECKLENBURG: Okay.

THE COURT: So an internal reference to 7P2?

MS. MECKLENBURG: Yes.

THE COURT: That's fair. Okay.

MS. DIAZ: Your Honor, and just to clear things up, even though it is listed that he can travel, he would still need preapproval from pretrial services to leave the house.

THE COURT: Right.

MS. DIAZ: So even though it is listed that he can travel, like to the Continental U.S., he just can't leave. He still needs to ask pretrial service -- he still needs approval from pretrial service --

THE COURT: Right. And my --

MS. DIAZ: -- to be able to leave the house.

THE COURT: And so, just to be perfectly clear, the point in doing this the way I'm doing it is so that he doesn't -- let's say he gets a job interview in -- I used Kansas City earlier -- Kansas City. He doesn't need to go to court to get a court order to leave the Southern District of Texas to go to Kansas City for work, which is what would happen if we limited his travel to the Southern District of Texas and the Northern District of Illinois.

And so I want to leave him some ability to find this new job, because he has to find a new job. And if there are things that come up that require him to travel for work, he can do that.

So I understand the concern. We have got a cross reference now. I think we have got belt and suspenders. We're all on the same page.

Do you have any questions about any of this, Mr. Chaudhry?

THE DEFENDANT: No, your Honor.

THE COURT: Okay. Counsel?

MR. ROADMAN: Your Honor, I mean, we (unintelligible) down the road of where you're going on this. But, you know, this is a condition of home detention, which is actually more restrictive than what pretrial services, you know, recommended down in Houston, pretrial services recommended up here, and that the Court imposed in Houston.

I mean, the practical reality of criminal cases in the Northern District of Illinois is from the time of indictment to the time of actually a resolution can be years. And that means he's going to be on home detention for absolutely years.

If we have got him on electronic monitoring with GPS technology, seems awfully restrictive to not be able to go out and not -- he says, I want to go out and take a run. I want to go run to the grocery store. I need to go to the dry cleaner. And he's not going to be allowed to do any of that stuff for quite an experience -- a period of time under home detention.

And I think we have already got this covered just under standalone monitoring with GPS. If he -- if he takes

a -- tries to take off, they're going to know right away because of the GPS.

THE COURT: Ms. Mecklenburg, do you have anything to say to that?

MS. MECKLENBURG: No, your Honor. I think that what -- your original conditions were appropriate. I think what Mr. Roadman is raising is that he be on electronic monitoring then all the time. I'm getting that. And I thought that was what he was objecting to because he thought that would make it harder for him to get a job. So --

THE COURT: Well, I think he was objecting to it. It was over on his objection that I imposed it.

MS. MECKLENBURG: Yeah.

THE COURT: I think now what he's saying is, you know, he's -- he's essentially stuck in the house with no ability to do anything other than the delineated exceptions, and so he's asking me to revisit that.

MR. ROADMAN: That's correct.

MS. MECKLENBURG: And if he has no objection then to full-time electronic monitoring, then that might take the place of home detention.

THE COURT: Well, he will have full-time electronic monitoring with GPS. That's already there.

MS. MECKLENBURG: Okay.

THE COURT: That's 7Q.

MS. MECKLENBURG:  Okay.

MR. ROADMAN:  That's right.

MS. MECKLENBURG:  Then I'm going to just stand on my request for -- on my -- on the Court's original order.  I think that it is okay that he doesn't necessarily have to go -- get to go for a run when he feels like it.  I don't think that's an overly burdensome restriction.

THE COURT:  You know what, I'm actually -- I'm going to remove -- I understand everyone's positions.  I think Mr. Roadman's argument is a good one.  He's going to be on GPS monitoring.  He's going to be monitored in realtime all the time in terms of his location.  So I'm going to remove the location restriction of home detention.

And I guess what I would say, Mr. Chaudhry, is if there is any issue that comes up, if there is any concern that's raised from pretrial, I certainly can put that back in place or I can put even a more onerous restriction in place in terms of confining you to the home 24/7 if that's something that becomes a problem.

But right now I hear what Mr. Roadman is saying.  You know, you're going to have to live your life.  And at this point I don't think there is anything to suggest that -- there is really no evidence that we have in front of us that you pose a serious risk of flight.

I understand the government's position with respect to

these things. But we have the electronic monitoring here. We have GPS. And it is going to be at the discretion of pretrial services, obviously, with respect to that how that technology is implemented. But that's the condition that's in place, okay?

MS. MECKLENBURG: So just to be clear, your Honor, you're ordering P4 and Q4 subject to the technology being at the discretion of pretrial services?

THE COURT: Correct.

MS. MECKLENBURG: Okay.

THE COURT: Thank you.

MS. MECKLENBURG: Just making sure I had it right.

THE COURT: You do. And so that will change -- we'll remove the cross reference from the travel restriction too.

MS. MECKLENBURG: Ah, yes.

THE COURT: Okay.

MS. MECKLENBURG: And I don't know this, your Honor, I don't know that the GPS, does that work across the Continental United States?

THE COURT: Do you -- officer, do you know the range of the GPS?

MS. DIAZ: That would be something determined by his officer, your Honor. It is something that we could put in place in the system that's being used to monitor the defendant's movement.

THE COURT: Okay. So I guess what I would like to do is with respect to how the technology works and what its limits are, I would ask that defense counsel confer with pretrial services down in the Southern District of Texas and file a brief status report by a week from today that just gives us some information about the range and the technology and how it is used when somebody is able to travel within the Continental United States. If pretrial there is able to keep tabs on where a person is. You know, I -- my guess is that it probably is just a function of whether they are -- somewhere where there is a cell tower.

MR. ROADMAN: Right.

THE COURT: But I don't know that. And I guess we should know that.

And so Ms. Mecklenburg, if what we get back in that report is concerning to you or causes any concern, then we can come back and talk about a modification.

MS. MECKLENBURG: That's fine, your Honor.

THE COURT: Okay. The only other condition that I would like to put in place is I'm going to require a signature bond in the amount of $50,000. That's the same amount that was imposed, I believe, in the Southern District of Texas.

And so Mr. Chaudhry, what that means is that you're -- and I'm sure the judge down in Texas explained this to you too. You're signing your name for a particular dollar

amount, $50,000. You don't have to put up money in order to be released. But what you're signing and you're saying that if you don't comply with the conditions of release, you don't follow the rules, if there are any violations, the government has the ability to come after you for $50,000.

Do you understand that, sir?

THE DEFENDANT: Yes, your Honor.

THE COURT: Okay. And that's on top of, if you violate the conditions of release generally, your bond can be revoked.

Do you understand that, sir?

THE DEFENDANT: Yes, your Honor.

THE COURT: Which means that you would be taken into custody.

In addition, the penalties that you face in this case could increase if there are issues with your compliance with bond. And noncompliance with bond can also, in certain circumstances, lead to the filing of additional charges.

Do you understand all that, sir?

THE DEFENDANT: Yes, your Honor.

THE COURT: Okay. So like the bottom line, Mr. Chaudhry, is this: Folks do much better when they're on bond than they do when they're in jail. It is easier to talk to your lawyers. It is easier to play a meaningful role in your own defense.

I know you're a very intelligent person. I am sure it is very clear to you that you're in a much better position than you would be if you were detained. This is an opportunity for you to demonstrate to the Court -- you're presumed innocent, obviously, and that presumption stays with you throughout the case. But you're going to be essentially showing your trial judge, Judge Coleman, that you take this seriously. And it is going to put you in a much better position if you make the most of your time on bond.

Okay. Do you understand that, sir?

THE DEFENDANT: Yes, your Honor.

THE COURT: Okay. So I -- the order that I have up here that I have been working off of -- I don't know if you have all been taking notes while I have been doing this -- mine is a mess, so --

MS. MECKLENBURG: Okay. We can work one out.

MR. ROADMAN: We'll work one out.

MS. MECKLENBURG: I have extra copies -- forms.

THE COURT: And so why don't we do that and have Mr. Chaudhry sign it. And then I'll sign it and countersign it when we go back on the record.

And then the other thing that we'll do at that point is I'll take any motions. I'm sure there will be a motion to exclude time.

MS. MECKLENBURG: Yes.

THE COURT: And I'll give you Judge Coleman's schedule at that point.

MS. MECKLENBURG: Can I --

THE COURT: Is there anything else that we need to take up today?

MR. ROADMAN: The only thing is just a housekeeping matter.

THE COURT: Yes.

MR. ROADMAN: For us, as you know, we filed appearances electronically yesterday.

THE COURT: Okay.

MR. ROADMAN: The Northern District of Illinois does not represent -- or does not recognize special and limited appearances. There isn't a form for special or limited.

We're appearing today for initial appearance and for the detention hearing. We have not formally entered into a, you know, retainer agreement yet or worked out a retainer arrangement for trial with Mr. Chaudhry. We expect we will do so between now and when we appear in front of Judge Coleman.

But if not, we may be -- you know, we may have to revisit that issue. So we just wanted to put that on the record.

THE COURT: Okay. Okay. And if that's something that comes to pass, then you can take that up with Judge Coleman in terms of withdrawing and either having new counsel come in or

appointment of counsel will be something.

Sir, when you first appeared down in Texas, the Judge there made you aware of your rights to a lawyer. And I know you probably received a lot of information on that date, and it was a stressful day. But I'll just emphasize for you sir, you have the right to a lawyer. You have a right to talk to your lawyer at any time. If you can't afford a lawyer at a certain point, the Court will appoint a lawyer to represent you. Okay?

So in this district that might mean the Federal Defender Program, which is the public defenders for the federal court. Or if one of those lawyers has a conflict in this matter, or already represents somebody else, then we -- there is what's called a CJA Panel, which is a panel of private lawyers who take appointed cases.

And so if you are not able to afford counsel, you will still have a lawyer, and a lawyer will be appointed to represent you.

Do you understand that, sir?

THE DEFENDANT: Yes, your Honor.

THE COURT: Okay. So why don't we take a brief recess to complete the paperwork. Let's say -- is five minutes enough, do you think?

MS. MECKLENBURG: I think.

MR. ROADMAN: Sure.

MS. MECKLENBURG: Yeah.

THE COURT: Okay. We'll take five minutes. Thank you.

(Brief recess.)

THE COURT: Okay. Good afternoon again, everyone. And so we're back on the record here in Mr. Chaudhry's case. I have got the completed conditions, the order setting conditions of release in front of me.

Mr. Chaudhry, we just went over these a moment ago. During the break, did you have any questions or concerns that came to mind, sir?

THE DEFENDANT: No, your Honor.

THE COURT: Okay.

MR. ROADMAN: Your Honor, the only question we had was 7Q4.

MS. MECKLENBURG: Yes, Q.

MR. ROADMAN: Q4 was selected. And what -- with your direction, GPS at the discretion. Q1 says location monitoring at the discretion. We just wanted to make clear we selected the appropriate one you had ordered.

THE COURT: Yeah. GPS is what I ordered. So that's correct.

MR. ROADMAN: Thank you.

THE COURT: Ms. Mecklenburg, the attachment with respect to -- oh, so I see, you noted the list as provided to counsel.

MS. MECKLENBURG: Yes.

THE COURT: And that's agreeable to counsel?

MR. ROADMAN: I'm sorry?

THE COURT: The list of folks for indirect and direct contact, that you have that list?

MR. ROADMAN: Yes, we have that list.

THE COURT: Okay. Is there anything you don't want to include as part of the order.

MS. MECKLENBURG: I have never included it as part of an order before until this case, and then it was included. And usually I don't because of the concern that it is going to be accessed by the public, and that's what happened here. So I -- if that's what you want me to do, then we will obviously do it. But I do have a concern about --

THE COURT: No, I think -- I'll -- I am respectful of your concern. I guess the only issue I want to raise is just in the event there is any question that arises about contact, as long as you folks are all on the same page about who is on that list and which list you're using, then I think you would be able to submit it to me or to Judge Coleman or to whomever to figure out if there is a problem.

Is that fair?

MS. MECKLENBURG: That's fine for the government, your Honor. I will trust counsel that we're on the same page.

MR. ROADMAN: I am (unintelligible).

THE COURT: Okay. So Mr. Chaudhry, you haven't signed this one yet. And so these are the conditions of release. I'm going to hand this back to you in one moment. But I'm going to give you two things to sign.

And then I also have an appearance bond here, which is signed, which just says that if you -- this is what we talked about with the $50,000 pledge.

Do you understand that, sir?

THE DEFENDANT: Yes, your Honor.

THE COURT: Okay. Do you have any questions about that?

THE DEFENDANT: No, your Honor.

THE COURT: Okay. So I'm signing that. And then I'm going to hand back the order setting conditions of release. I'll sign it now.

He needs to sign the order setting conditions of release.

(Brief interruption.)

THE COURT: Okay. So while that is being done, the schedule from Judge Coleman requires the Rule 16 conference by July 15th.

And there is a status hearing in Judge Coleman's courtroom on August 6th at 9:45 A.M. So that is Judge Coleman's schedule.

MS. MECKLENBURG: And at this time, the government

moves to exclude time until the next court date on August 6th in order to allow for discovery, having the Rule 16 conference, and for discovery.

THE COURT: Any objection?

MR. ROADMAN: No objection.

THE COURT: Okay. So time will be excluded for the reasons stated on the record.

Is there anything else to take up today?

MS. MECKLENBURG: Not from the government, Your Honor.

MR. ROADMAN: No.

THE COURT: Okay. Mr. Chaudhry, I wish you the best of luck. Okay, sir?

THE DEFENDANT: Thank you, your Honor.

THE COURT: Okay.

MS. MECKLENBURG: Thank you, your Honor.

MR. ROADMAN: Thank you, Judge.

THE COURT: Thank you.

(Which concluded the proceedings.)

CERTIFICATE

I certify that the foregoing is a correct transcript from the digital recording of proceedings in the above-entitled matter to the best of my ability, given the limitation of using a digital-recording system.

*/s/Pamela S. Warren*                    August 1, 2025
Official Court Reporter – Retired              Date
United States District Court
Northern District of Illinois
Eastern Division