IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

UNITED STATES OF AMERICA,

        Plaintiff,

        v.

ANOSH AHMED,
MOHAMED SIRAJUDEEN,
    aka "SIRAJ,"
MAHMOOD SAMI KHAN,
    aka "SAMI," and
SUHAIB AHMAD CHAUDRY,

        Defendants.

Case No. 1:25-cr-00321-4

Hon. Sharon Johnson Coleman

### DEFENDANT SUHAIB CHAUDHRY'S MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR SEVERANCE AND TO STRIKE

NOW COMES Defendant, Suhaib Ahmad Chaudhry ("Chaudhry"), by and through his undersigned attorneys, and for his Memorandum of Law in Support of Motion for Severance and to Strike, states as follows:

## I. Introduction

On June 12, 2025, a twenty-four (24) count Indictment was filed (Doc #1) that charged Defendants Anosh Ahmed ("Ahmed"), Mohamed Sirajudeen ("Sirajudeen"), Sami Khan ("Khan") and Chaudhry. Counts 1-14 charge that Ahmed and Khan (Counts 7, 8, 11, 13), along with Sirajudeen, engaged in a scheme in violation of the federal wire fraud statute to submit false claims to the Health Resources and Services Administration ("HRSA") for COVID-19 testing of specimens purportedly collected from uninsured individuals, knowing that such testing had not occurred. (Doc. 1, Count 1 ¶¶ 2 and 3). Counts 15-17 charge that Ahmed, along with Sirajudeen, engaged in a scheme where Sirajudeen would pay kickbacks to Ahmed to order Covid-19 testing services from a laboratory in Chicago in violation of 18 USC § 371 or Title 42 of the United States Code. Count 18 charges Ahmed with a violation of Title 42 of the United States Code for using individually identifiable health information for commercial advantage. Counts 20-24 charge either Ahmed or

Sirajudeen with money laundering for financial transactions involved in the kickback scheme charged in Counts 15-17.

Chaudhry is not charged in any of these counts. Rather, the sole count that he is charged in is Count 19. That Count incorporates allegations from certain paragraphs of Counts 1 and 15 and charges that Ahmed, Khan and Chaudhry, along with Sirajudeen, knowingly conspired to commit money laundering by conducting a financial transaction involving property that represented proceeds of wire fraud and kickback violations.

For the reasons hereinafter stated, because the Indictment charges two unrelated and separate schemes, one of which, the kickback related and money laundering charges in Counts 15-18 and Counts 20-24, does not even facially involve Chaudhry, or for that matter, Khan, those counts should be severed from the remaining Counts and the incorporation of paragraphs 1 through 9 of Count 15 into Count 19 should be stricken.

## II. The Indictment

### A. Counts 15 – 17 and 20 -24: The Alleged Ahmed/Sirajudeen Kickback Scheme and Related Money Laundering Counts

Counts 15 -17 charge that from June through September 2021 Ahmed, along with Sirajudeen, engaged in a scheme where Sirajudeen paid kickbacks to Ahmed to order Covid-19 testing services from a laboratory in Chicago in violation of 18 USC § 371 and Title 42 of the United States Code. As part of the charges, Counts 15, 16 and 17 incorporate paragraphs 1.a. through 1.s., 7 through 9, 13, 14, 16.a. through 16.e., 19, and 38.a. through 38f. of Count 1. Deciphering what was involved from the incorporated allegations from Count 1 and the other allegations of Counts 15-17, here is what is alleged to have occurred:

From around July 2018 until on or about March 26, 2021, Ahmed, a medical doctor, served as the COO and CFO of Hospital A, a small hospital on the west side of Chicago. (Count 1, ¶1.o. and p.). Since 2018, Ahmed also owned and operated Global Healthcare Consulting Group LLC ("Global Healthcare") and Westside Pharmacy, LLC ("Westside Pharmacy"). (Count 1, ¶ 1.q.). O'Hare Clinical Lab Services, Inc. ("OCL") was a clinical laboratory in Chicago incorporated in or around 2006 that was operated and managed by Sirajudeen. (Count 1, ¶ 1.r.). Sirajudeen also owned and operated Chicago Polyclinic, LLC ("Chicago

Polyclinic"), a management company in Chicago, that in September 2020 entered into an agreement to provide management and administrative support services to OCL. (Count 1, ¶ 1.s.). Sirajudeen was responsible for overseeing the processing and submission of all testing, including Covid-19 testing, at OCL until HRSA ceased reimbursing OCL for Covid-19 testing in or around September 2021 under the HRSA Program. (Count 1, ¶¶ 1.f. and s.).

According to the allegations in Count 15, Ahmed and Sirajudeen conspired to pay and receive illegal kickbacks from OCL to Ahmed in exchange for Ahmed, purportedly on behalf of Hospital A (who Ahmed did not work for after March 2021) and Westside Pharmacy, ordering Covid-19 tests at OCL for purposes of billing those Covid-19 tests to the HRSA Program. (Count 15, ¶ 4). To disguise the kickbacks as lawful payments, Sirajudeen, as manager of OCL and Ahmed, on behalf of Westside Pharmacy, entered into an agreement in June 2021 calling for OCL to pay a fee to Westside Pharmacy for Covid-19 tests conducted by OCL on biological specimens purportedly collected by Hospital A and sent to OCL for Covid-19 testing and that OCL would submit such tests to HRSA for payment. (Count 15, ¶ 6). As alleged in Count 15, from approximately June through October 2021 OCL caused approximately $642 million in claims for Covid-19 tests to be submitted to HRSA. HRSA paid OCL a total of at least $201 million based on those claims, and Sirajudeen, using accounts of OCL or Chicago Polyclinic, paid, and Ahmed received, in accounts in his name and in the names of entities he owned, approximately $147,091,992 in kickbacks and bribes. (Count 15, ¶¶ 5 and 7).

Chaudhry, and Khan, are not alleged to have been involved in this kickback scheme. In fact, the paragraphs of Count 1 (1.a. through 1.s., 7 through 19, 13, 14, 16.a through 16.e., 19 and 38a. through 38.f.) incorporated into Counts 15-17 make no mention of either Chaudhry or Khan, let alone make any allegations about activity by them.

Counts 20-24 allege and charge violations of the federal money laundering statute, 18 U.S.C. § 1956(a)(1)(B)(i), by Ahmed (Counts 20-22, 24) and Sirajudeen (Count 23) stemming from Ahmed and Sirajudeen's separate kickback scheme alleged in Counts 15 through 17. Each of the charged payments

occurred in either August or September 2021 and were between accounts of Westside Pharmacy, OCL or entities that, according to the Indictment, have no connection to Chaudhry or Khan.

**B.**      <u>Count 18: Ahmed's Alleged Use of Hospital A Patient Information for Personal Gain</u>

Count 18 alleges that on or about April 14, 2021, Ahmed without authorization knowingly obtained individually identifiable health information related to patients of Hospital A and used that information for commercial advantage and personal gain in violation of 42 U.S.C. 1320d-6(a)(2) and (b)(3). Again, nowhere does the Indictment make any allegations that Chaudhry, or Khan, was aware of, let alone involved in, the alleged conduct by Ahmed on or about April 14, 2021.

**C.**      <u>Counts 1 – 14: The Alleged Wire Fraud Scheme to Submit False Claims for Covid-19 Testing to HRSA</u>

As alleged in paragraph 1.a. of Count 1, in or around December 2019, severe acute respiratory syndrome coronavirus 2, the virus that causes Covid-19, began to spread around the world. Between March 2020 and March 2021 multiple federal laws were enacted to provide funding for reimbursement to hospitals and other healthcare providers for Covid-19 and other related services for uninsured individuals. (Count 1, ¶ d.). To seek reimbursement, providers were required to submit information to HRSA about the patient and services provided and to make certain representations about the truth and completeness of information submitted. (Count 1, ¶¶ 1.i. and j.). HRSA reimbursed laboratories at certain rates depending on what type of testing of patient specimens was done. (Count 1, ¶ 1.l.). On or about March 15, 2022, HRSA notified providers that, due to a lack of sufficient funds, it would stop accepting claims for Covid-19 testing on March 22, 2022. (Count 1, ¶ 1.m.).

Paragraph 2 of Count 1 of the Indictment then alleges that beginning in April 2021 and continuing to at least in or around June 2022, Ahmed and Khan, along with Sirajudeen, knowingly devised, intended to devise and, participated in a scheme to defraud, and to obtain money owned by HRSA by means of false and fraudulent pretenses, representations and promises, including that patient information and samples were being obtained under the auspices of Hospital A. (Count 1, ¶¶ 2, 16). A careful reading of Count 1 reveals that the Indictment blends together two separate Ahmed activities.

**1.** **Ahmed and Sirajudeen's Fraudulent Billing Activity Through OCL**

As alleged in Count 1, from June 2021 to in or around September 2021, Ahmed submitted and caused to be submitted to OCL patient data in support of claims for purported Covid-19 testing of uninsured individuals and caused OCL to bill HRSA approximately $642,070,245 and obtain approximately $201,772,694 from HRSA attributable to those Claims. (Count 1, ¶¶ 14 and 20). Ahmed allegedly did so after submitting patient identifying information to OCL for more than a million patients, representing that the identifying information was for uninsured individuals who had submitted biological samples for Covid-19 testing knowing that the purported patients had not submitted biological samples (Count 1, ¶ 15) and Sirajudeen caused OCL to submit claims to HRSA from the patient lists Ahmed submitted and caused to be submitted to OCL knowing that OCL had not performed testing associated with those patient lists. (Count 1, ¶ 17).

**2.** **The Allegations of Post-September 2021 Fraudulent Billing Activity**

The balance of Count 1 of the Indictment contains allegations that after HRSA disqualified OCL from submitting claims in September 2021, Ahmed continued fraudulent billing to HRSA for Covid-19 testing of patient specimens through entities in Texas that he caused to be purchased or formed.

In October 2021 Ahmed caused Global Healthcare to purchase all of the stock of Summer Diagnostic, LLC ("Summer Diagnostic"). (Count 1, ¶ 22). Starting in or around November 2021, Ahmed caused Khan to form Apollo Labs, LLC ("Apollo"), and Chaudhry to form SoftLand Labs, LLC ("SoftLand"), Artemis Labs, LLC ("Artemis") and Helios Labs, LLC ("Helios"). (Count 1, ¶¶ 22-26). Collectively, the Indictment refers to these entities as "AHMED's Non-Operational Texas Laboratories." (Count 1, ¶ 21). The paperwork filed with the Texas Secretary of State identified Khan or Chaudhry as the Registered Agent, Manager and Organizer of the entities they respectively formed. (*Id*.). In November or December 2021, Ahmed and Chaudhry caused Clinical Laboratory Improvements Act ("CLIA") certificates to be filed with the Center for Medicare and Medicaid Services ("CMS") identifying Chaudhry as the owner and director of SoftLand and Helios. (Count 1, ¶¶ 24.a. and 26.a.). In late November or early December 2021, bank accounts were also

opened in the names of Summer Diagnostic, Artemis and Helios that Chaudhry was one of the signatories on. (Count 1, ¶¶ 22.c., 25.b. and 26.b.).

Individual F was an executive at Hospital A until April 12, 2022. (Count 1, ¶ 1.aa.). No later than January 2022, Individual F became an employee or contractor of Anosh, Inc., an entity owned by Ahmed since at least August 2020, where Individual F's responsibilities included management roles and positions of authority, including Chief Medical Officer for AHMED's Non-Operational Texas Labs, including SoftLand. (Count 1, ¶¶ 1.q., 1.aa., 21 and 28).

Individual B was a former employee of Hospital A who resided and worked in the Northern District of Illinois. (Count 1, ¶ 1.w.). Individual B was hired by Ahmed to conduct billing for AHMEDs Non-Operational Texas Labs, including SoftLand, specifically to submit claims to HRSA for reimbursement for Covid-19 testing of the uninsured. (*Id.*).

Count 1 alleges that, despite none of AHMED's Non-Operational Texas Labs conducting Covid-19 tests on biological samples collected from individuals, Ahmed and Khan submitted and caused to be submitted false claims to HRSA for Covid-19 testing and obtained reimbursement for those claims on behalf of SoftLand, Summer Diagnostic and Apollo. (Count 1, ¶ 29). For SoftLand, it is alleged that from on or about March 9, 2022 through on or about March 25, 2022, Ahmed caused SoftLand to submit to HRSA false claims for PCR and antigen Covid-19 tests purportedly occurring from on or about December 14, 2021 through on or about February 23, 2022 when SoftLand conducted no testing during that time and obtaining reimbursement for those claims. (Count 1, ¶ 29.c.).

Count 1 does not allege that Covid-19 testing of specimens collected from individuals was not conducted for the claims submitted by SoftLand. Rather, it alleges that SoftLand did not conduct Covid-19 tests on biological samples collected from individuals. Nor does Count 1 allege that Chaudhry was involved in the billing process for the claims submitted to HRSA for SoftLand or knowledge by Chaudhry as to what was billed for and when.

Count 1 does allege that on March 23, 2022 Chaudhry opened and caused to be opened a bank account in the name of SoftLand as the sole signatory and identified himself as a member of SoftLand.

(Count1, ¶24.b.). Count 14 charges Ahmed with wire fraud for a May 5, 2022 wire transfer to that account from HRSA for false claims of Covid-19 testing submitted by SoftLand. Chaudhry is not charged in Counts 1-14.

**D.**    **Count 19: The Money Laundering Conspiracy Charge**

Count 19 is the only count that Chaudhry is charged in. That count alleges that in violation of 18 U.S.C. § 1956(h), beginning in or around August 2021 and continuing through in or around January 2023 Ahmed, Khan and Chaudhry, along with Sirajudeen, conspired to:

1.    knowingly conduct a financial transaction involving proceeds of a specified unlawful activity, knowing that the property involved in the transaction represented the proceeds of some form or unlawful activity, and knowing that the transaction was designed, in whole or in part, to conceal and disguise the nature, location, source, ownership and control of proceeds of specified unlawful activity in violation of 18 U.S.C. § 1956(a)(1)(B)(i);, and

2.    knowingly engage in a monetary transaction in criminally derived property of a value greater than $10,000 which property is derived from specified unlawful activity, knowing that the transaction involved criminally derived property, in violation of 18 U.S.C. § 1957.

The specified unlawful activity alleged is wire fraud and violations of the Anti-Kickback statute and Count 19 incorporates the allegations of paragraphs 1 through 38 of Counts 1 through 14 and paragraphs 1 through 9 of Count 15. Nowhere in Count 19 does it set forth the particular financial transaction that Ahmed, Khan, Chaudhry and Sirajudeen conspired to knowingly conduct or engage in, or the identity of the others known and unknown to the Grand Jury, with whom they conspired.

**E.**    **Summary of Charges**

The following chart summarizes the charged counts:

| Count | Defendant(s) | Violation |
|---|---|---|
| 1 | Ahmed | 18 U.S.C. 1343 |
| 2 | Ahmed | 18 U.S.C. 1343 |
| 3 | Ahmed | 18 U.S.C. 1343 |
| 4 | Ahmed | 18 U.S.C. 1343 |
| 5 | Ahmed | 18 U.S.C. 1343 |
| 6 | Ahmed | 18 U.S.C. 1343 |
| 7 | Ahmed, Khan | 18 U.S.C. 1343 |
| 8 | Ahmed, Khan | 18 U.S.C. 1343 |
| 9 | Ahmed | 18 U.S.C. 1343 |

| 10 | Ahmed | 18 U.S.C. 1343 |
|---|---|---|
| 11 | Ahmed, Khan | 18 U.S.C. 1343 |
| 12 | Ahmed | 18 U.S.C. 1343 |
| 13 | Ahmed, Khan | 18 U.S.C. 1343 |
| 14 | Ahmed | 18 U.S.C. 1343 |
| 15 | Ahmed | 18 U.S.C. 371 |
| 16 | Ahmed | 42 U.S.C. 1320a-7b(b)(1)(B) |
| 17 | Ahmed | 42 U.S.C. 1320a-7b(b)(1)(B) |
| 18 | Ahmed | 42 U.S.C. 1320d-6(a)(2) and (b)(3) |
| 19 | Ahmed, Khan, Chaudhry | 18 U.S.C. 1956(h) |
| 20 | Ahmed | 18 U.S.C. 1956(a)(1)(B)(i) |
| 21 | Ahmed | 18 U.S.C. 1956(a)(1)(B)(i) |
| 22 | Ahmed | 18 U.S.C. 1956(a)(1)(B)(i) |
| 23 | Sirajudeen | 18 U.S.C. 1956(a)(1)(B)(i) |
| 24 | Ahmed | 18 U.S.C. 1956(a)(1)(B)(i) |

### III. <u>Argument</u>

#### A. <u>Legal Standard</u>

Fed. R. of Crim. P. 14 provides that if joinder of offenses in an indictment "appears to prejudice a defendant or the government, the Court may order separate trials of counts, sever the defendants' trials, or provide any other relief that justice requires." The district court is given wide discretion in determining when prejudice of joinder outweighs the benefit of a single trial. *United States v. Carrillo,* 435 F.3d 767, 778 (7th Cir. 2006)(citing Fed. R. Crim. P. 14). Severance should be granted only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants or prevent the jury from making a reliable judgment about guilt or innocence." *Id.*, citing *Zafiro v. United States*, 506 U.S. 534, 539, 113 S. Ct. 933 (1993). District courts "must not shirk their duties under Rule 14," and "should vigilantly monitor for developing unfairness and should not hesitate to order severance at any point after indictment if the risk of real prejudice grows too large to justify whatever efficiencies a joint trial does provide." *United States v. Coleman,* 22 F.3d 126, 134 (7th Cir. 1994).

As a general matter, the Rule 14 analysis is grounded in fundamental fairness concerns and involves balancing the government's interest in joint trials against countervailing considerations.

*United States v. Velasquez,* 772 F.2d 1348, 1355-56 (7th Cir. 1985). Granting a severance in the advent of disparate evidence, prevents transference of guilt and allows a Defendant to stand trial on the basis of his own alleged conduct rather than *en masse. United States v. Maridan,* 546 F.2d 973, 977 (D.C. Cir. 1976); *Kotteakos v. United States,* 328 U.S. 750, 775, 66 S. Ct. 1239 (1946) (defendant has "the right not to be tried *en masse* for the conglomeration of distinct and separate offenses committed by others"); *United States v. Hardin,* 209 F.3d 652, 664 (7th Cir. 2000) ("Joint trials do create the danger that the little fish will be lumped together with the big fish."); *United States v. Moya-Gomez,* 860 F.2d 706, 765 (7th Cir. 1988) ("Denial of a motion for severance may be an abuse of discretion if there is a great disparity of evidence between the moving Defendant and his co-defendants").

In this case, both the massive volume of evidence and gross disparity in both the amount and type of evidence against Chaudhry and Khan *vis-a-vis* their co-Defendants warrants severance.

**B.** **Counts 15 – 18 and 20 – 24 Should be Severed From the Trial of the Remaining Counts of the Indictment.**

In the case before the Court, even without the addition of a kickback scheme, and money laundering related to that kickback scheme, that only involves Ahmed and Sirajudeen, there is already a gross disparity between the evidence against Ahmed and Sirajudeen on the one hand, and that against Chaudhry on the other hand who is uninvolved. Here, however, the addition of that additional kickback and money laundering evidence that only involves Ahmed and Sirajudeen requires severance because it unfairly increases the already present danger of a small fish like Chaudhry getting swept up in the torrent of evidence against Ahmed and Sirajudden.

As alleged in the wire fraud scheme charges in Count 1, before October 2021, Ahmed submitted and caused to be submitted to OCL, the lab that Sirajudeen operated and managed, patient data in support of claims for purported Covid-19 testing of uninsured individuals and caused OCL to

bill HRSA approximately $642,070,245 and obtain approximately $201,772,694 from HRSA attributable to those claims. (Count 1, ¶¶ 14 and 20). Ahmed allegedly did so after submitting patient identifying information to OCL for more than a million patients, representing that the identifying information was for uninsured individuals who had submitted biological samples for Covid-19 testing knowing that the purported patients had not submitted biological samples (Count 1, ¶ 15) and Sirajudeen caused OCL to submit claims to HRSA from the patient lists Ahmed submitted to OCL knowing that OCL had not performed testing associated with those patient lists. (Count 1, ¶ 17).

According to the kickback allegations in Count 15 through 17, also prior to October 2021, Ahmed and Sirajudeen conspired to pay and receive illegal kickbacks from OCL to Ahmed in exchange for Ahmed ordering these same Covid-19 tests at OCL for purposes of billing them to the HRSA Program. (Count 15, ¶ 4). To disguise the kickbacks as lawful payments, Sirajudeen, as manager of OCL and Ahmed, on behalf of Westside Pharmacy, entered into an agreement in June 2021 calling for OCL to pay a fee to Westside Pharmacy for Covid-19 tests conducted by OCL on biological specimens purportedly collected by Hospital A and sent to OCL for Covid-19 testing and that OCL would submit such tests to HRSA for payment. (Count 15, ¶ 6). During this same timeframe, Sirajudeen, using accounts of OCL and another entity he owned, paid, and Ahmed received, in accounts in his name and in the names of entities he owned, approximately $147,091,992 in kickbacks and bribes. (Count 15, ¶¶ 5 and 7).

Counts 20-24 simply allege and charge violations of the federal money laundering statute by Ahmed (Counts 20-22, 24) and Sirajudeen (Count 23) stemming from the kickback scheme alleged in Counts 15 through 17. Count 18 adds little else, alleging that in April 2021, Ahmed without authorization obtained individually identifiable health information related to patients of Hospital A and used that information for his own commercial advantage and personal gain.

Thus, at trial, the Government intends to present evidence that prior to October 2021, Ahmed and Sirajudeen falsely billed HRSA for approximately $642 million for Covid-19 tests that were not performed by OCL, OCL received almost $202 million for those tests and that Sirajudeen paid kickbacks to Ahmed of over $147 million using accounts of entities that, according to the Indictment, have no connection to Chaudhry.

The Indictment does not allege any facts that Chaudhry or Khan were involved in the fraudulent billing of HRSA by OCL or were aware of the kickback scheme, or that they had any intent to join the kickback conspiracy between Ahmed and Sirajudeen. It is completely devoid of any facts connecting Chaudhry to the kickback scheme or any of the entities owned by Ahmed and Sirajudeen they used to make or receive the kickback payments. *See United States v. Rajaratnam*, 753 F. Supp. 2d 299, 308-09 (S.D.N.Y. 2010) (finding that joinder of two defendants was improper because one defendant did not know about the other's separate unlawful activity); *United States v. Chierchio*, No. 20-CR-306, 2022 WL 523603, at *4 (E.D.N.Y. Feb. 22, 2022) (finding that no common scheme existed to warrant joinder because, *inter alia*, there was no "allegation that each of the lottery co-conspirators were even aware of the extortion scheme").

Based on past experience, it is anticipated that the Government will respond to the relief requested here, with the normal refrain that limiting instructions can be given to the jury to guide it as to what evidence can be considered against which defendants and for what purposes only. However, no limiting instruction that the Court could give the jury would correct the overwhelming resulting prejudice to Chaudhry. On the one hand, the jury would be receiving and considering inflammatory and incriminating evidence about a kickback scheme in which Ahmed received over $147 million from kickbacks related to the Covid-19 testing that the Government also alleges was fraudulent , while on the other hand being instructed by the Court not to consider that same evidence against Chaudhry because he was unaware of and not involved in the kickback scheme. Once a bell

has rung, instructing the jury to ignore the rung bell does not mean that they will. *See Krulewitch v. United States*, 336 U.S. 440, 453 (1949) (Jackson J. concurring) ("The naive assumption that prejudicial effects can be overcome by instructions to the jury…all practicing lawyers know to be unmitigated fiction.").

Limiting instructions have been recognized to be inadequate to cure potential prejudice where "a "gross disparity' in the evidence presents a danger that some defendants will suffer 'spillover prejudice' due to the accumulation of evidence against other defendants." *United States v. Stoecker,* 920 F. Supp. 867, 866 (N.D. Ill. 1996) (granting a defendant's severance motion after finding a "gross disparity" in evidence "both in quantity and quality" between the defendant and his co-defendants). This reality exists here.

Ahmed is charged with criminal wrongdoing in 23 of 24 counts in the Indictment. As evidence mounts against Ahmed on those charges, including the kickback related allegations, it cannot help but prejudice Chaudhry. *See United States v. Tsanges*, 582 F. Supp. 237, 241-41 (S.D. Ohio 1984) (as evidence against main defendant cumulated, the other defendants [the main defendant's mother and secretary] would be prejudiced). If the jury concludes that Ahmed and Sirajudeen engaged in the kickback scheme related to OCL's Covid-19 testing services provided before October 2021, the likelihood is high that they will also conclude that Ahmed engaged in "similar" criminality involving the Covid-19 testing services for which HRSA was billed after October 2021 by Ahmed's Non-Operational Texas Laboratories – thereby irreparably prejudicing Chaudhry's chances of acquittal on the money laundering conspiracy charged in Count 19, which incorporates by reference both the kickback and Covid-19 testing fraud schemes .

Finally, in considering whether severance should be granted under Rule 14, the Court should also not ignore the practical reality of the posture in which this case appears to be heading to trial. The Government has estimated that its case will last for 3 weeks. As it stands now, the Court will be

conducting a trial on a 24 count Indictment in which the two defendants at trial are only charged in 5 total counts. Ahmed is currently a fugitive, and the Court has transferred his case to the fugitive calendar. Sirajudeen will not be on trial, as it was represented in court at the last status hearing that he is cooperating with the government and, although he has not entered into a formal plea agreement yet, he has executed a plea letter after negotiations with the government. Given that reality, the Court should not allow a lengthy and complicated evidentiary presentation to the jury to be prolonged by permitting evidence about a conspiracy to pay kickbacks, and related money laundering allegations, in which the two defendants on trial are not charged or, even alleged to be involved.

Given all of the above, Counts 15 – 18 and Counts 20 - 24 should be severed from the trial of the remaining counts of the Indictment and the allegations from Count 15 incorporated by reference into Count 19 should be stricken

Date: November 7, 2025

Respectfully submitted,

SUHAIB CHAUDHRY

By: */s/ Leigh D. Roadman*
One of His Attorneys

Leigh D. Roadman (06193461)
Mason N. Floyd (06282874)
CLARK HILL PLC
130 East Randolph Street, Suite 3900
Chicago, Illinois 60601
T: 312-985-5900LDR4918.WPD:0117.001